# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-00944-COA

**DAREADELL (TERRELL) THOMPSON A/K/A**         **APPELLANT**
**TERRELL THOMPSON**

v.

**STATE OF MISSISSIPPI**         **APPELLEE**

DATE OF JUDGMENT:     03/28/2013
TRIAL JUDGE:     HON. ROBERT WALTER BAILEY
COURT FROM WHICH APPEALED:     LAUDERDALE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:     CHARLES W. WRIGHT JR.
ATTORNEY FOR APPELLEE:     OFFICE OF THE ATTORNEY GENERAL
    BY: LISA L. BLOUNT
DISTRICT ATTORNEY:     BILBO MITCHELL
NATURE OF THE CASE:     CRIMINAL - FELONY
TRIAL COURT DISPOSITION:     CONVICTED OF WIRE FRAUD AND
    SENTENCED TO FIVE YEARS IN THE
    CUSTODY OF THE MISSISSIPPI
    DEPARTMENT OF CORRECTIONS, WITH
    FOUR YEARS SUSPENDED, ONE YEAR
    TO BE SERVED UNDER THE INTENSIVE
    SUPERVISION PROGRAM, AND FIVE
    YEARS OF SUPERVISED PROBATION,
    AND TO PAY A $2,500 FINE AND $500 TO
    THE CRIME VICTIMS' COMPENSATION
    FUND
DISPOSITION:     AFFIRMED – 01/27/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., FAIR AND JAMES, JJ.**

**JAMES, J., FOR THE COURT:**

¶1.　Following a jury trial in the Circuit Court of Lauderdale County, Dareadell "Terrell"

Thompson was convicted of wire fraud and sentenced to five years in the custody of the

Mississippi Department of Corrections (MDOC), with four years suspended, one year to be served on house arrest, and five years of supervised probation. Thompson appeals. Finding no error, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2. Thompson was employed as a police officer with the City of Meridian Police Department (MPD). On January 11, 2008, MPD Detective Rita Jack filed a grievance against Thompson with MPD's Office of Internal Affairs (Internal Affairs). The grievance alleged that Thompson had forged Jack's signature, and the signature of Municipal Judge Robbie Jones, on a subpoena that Thompson issued to AT&T in order to obtain cellular-telephone records. MPD conducted an internal investigation headed by Lieutenant Dean Harper, head of MPD's Internal Affairs Division. According to Harper, he headed the investigation up to a certain point, then reported to MPD Police Chief B.D. Dubose, who continued the investigation to its conclusion.

¶3. On January 22, 2008, at Chief Dubose's request, Thompson underwent a polygraph examination. The polygraph examination was administered by Federal Bureau of Investigation Agent T.J. Sypniewski. Prior to the examination, Agent Sypniewski advised Thompson of his *Miranda* rights, and Thompson signed a *Miranda* rights waiver form. According to Agent Sypniewski, after the polygraph examination, Agent Sypniewski advised Thompson that he found Thompson's responses to be deceptive. Thompson then told Agent Sypniewski that he suspected that his wife was communicating with a man with whom she had a previous affair, and that he forged the signatures of both Detective Jack and Judge Jones on the subpoena and faxed the subpoena to AT&T in order to obtain his wife's

2

telephone records.[1]

¶4.    During the internal investigation, Chief Dubose consulted Mississippi Highway Patrol Investigator Danny Knight about the criminal nature of Thompson's actions. After being briefed on the incident, Investigator Knight told Chief Dubose that, in his opinion, the matter should be handled internally. At the conclusion of the internal investigation, Chief Dubose reported the forgery of the signatures on the subpoena to the mayor of Meridian and requested that disciplinary action be taken. On February 26, 2008, Chief Dubose issued a disciplinary-action letter to Thompson, in which Chief Dubose summarized the findings of the internal investigation[2] and informed Thompson of MPD's intent to terminate Thompson's employment. In a letter to Meridian Mayor John Smith, dated March 10, 2008, Chief Dubose recommended that disciplinary action be taken against Thompson in lieu of his termination. On March 18, 2008, Chief Dubose issued a revised disciplinary-action letter informing Thompson that MPD was taking disciplinary action against him in lieu of termination. As a result of his misconduct, Thompson was suspended without pay for a period of ten weeks and demoted to the rank of police orderly, with a twelve-month probationary period. The letter further informed Thompson that he would not be considered for a promotion for a period of two years, and that he was required to undergo twelve months of mandatory

---

[1] At trial, Agent Sypniewski only testified to what Thompson communicated to him. The fact that a polygraph examination was conducted and the results of the examination were excluded from evidence.

[2] In summarizing the investigation, Chief Dubose stated that Investigator Knight was called in to investigate any possible criminal conduct that may have occurred as a result of Thompson's conduct. Chief Dubose stated that "Investigator Knight . . . informed us that [the forgery incident] would be a misdemeanor case."

counseling.

¶5.    In October 2009, Chief Dubose retired and was replaced by Chief Lee Shelbourn. According to Chief Shelbourn's testimony at trial, he met with Thompson on January 12, 2010, regarding the forgery incident.[3] During the meeting, Chief Shelbourn asked Thompson if he forged the signatures on the subpoena, and Thompson admitted that he forged the signatures.  Following the meeting, Chief Shelbourn referred the forgery incident to the Attorney General's Office for an independent criminal investigation.  Thompson's employment with MPD was terminated on January 27, 2010.

¶6.    Following a criminal investigation led by Investigator Roger Cribb of the Attorney General's Office, Thompson was indicted for wire fraud in violation of Mississippi Code Annotated section 97-19-83 (Rev. 2006) on August 12, 2011.  Prior to trial, Thompson filed a motion to dismiss attacking the sufficiency of the indictment and a motion to dismiss arguing that his alleged criminal conduct constituted one of numerous misdemeanor offenses. Thompson also filed a motion in limine seeking to exclude any evidence related to the polygraph examination, and a motion in limine seeking to suppress any statements that he made during the internal-affairs investigation, particularly statements made to Chief Dubose, Agent Sypniewski, and Chief Shelbourn admitting that he forged the signatures.  Likewise, the State filed several pretrial motions, including: a motion to prohibit the introduction of any testimony or other evidence concerning the possible sentence that Thompson would be

---

[3] At a motion hearing prior to trial, Chief Shelbourn testified that he met with Thompson on January 12, 2010, regarding seven disciplinary issues, one of which was the 2007 forgery incident.

4

subject to if found guilty; a motion to exclude evidence pertaining to any administrative, personnel, or disciplinary action taken against Thompson by the MPD; and a motion to exclude any opinion testimony by Investigator Knight as to whether Thompson's actions constituted a felony or a misdemeanor.

¶7.     A hearing on the various motions was held on April 23, 2012, and June 14, 2012.  On August 9, 2012, the trial court rendered its judgment on the various motions.  The trial court denied Thompson's motions to dismiss and his motion to suppress statements made during the internal investigation.  Thompson's motion to exclude any evidence related to the polygraph examination was granted; however, the alleged statement that Thompson made to Agent Sypniewski after the examination was not excluded.  Likewise, the trial court granted the State's motion to prohibit testimony concerning the possible sentence Thompson could receive if found guilty, but denied the State's motion to exclude any evidence pertaining to administrative, personnel, or disciplinary action taken against Thompson by the MPD.  Finally, the trial court granted the State's motion to exclude any opinion testimony by Investigator Knight pertaining to whether Thompson's alleged conduct constituted a felony or misdemeanor; however, the trial court ruled that Investigator Knight could give factual testimony regarding his investigation and any evidence found during that investigation.

¶8.     A jury trial was held on January 28-29, 2013.  Thompson was found guilty of wire fraud and was sentenced to five years in the custody of the MDOC, with four years suspended, one year to be served on house arrest, and five years of supervised probation.  Thompson now appeals raising the following issues: (1) whether the trial court erred by

failing to suppress statements he made during the internal investigation; and (2) whether he was prohibited from presenting evidence supporting his theory of defense.

## DISCUSSION

I. **Whether the trial court erred by failing to grant Thompson's motion to suppress statements Thompson made during the investigation.**

¶9. Thompson asserts that the trial court erred in denying his motion to suppress statements that he made during the internal investigation. Thompson argues that his statements should have been suppressed because the statements were used in violation of the *Garrity*[4] rule in that he was compelled to answer questions or face termination, and promised that any statements he made would be used solely for administrative disciplinary purposes.

¶10. A trial court's determination of whether a statement or a confession is voluntarily given is "essentially a fact-finding function." *Mettetal v. State*, 602 So. 2d 864, 868 (Miss. 1992) (quoting *Stokes v. State*, 548 So. 2d 118, 122 (Miss. 1989)). Thus, "[a] trial court's finding that a defendant's statements were voluntarily given cannot be reversed unless the court applied an erroneous legal standard or was clearly erroneous in its findings of fact." *Fulgham v. State*, 46 So. 3d 315, 339 (¶77) (Miss. 2010) (citing *Mettetal*, 602 So. 2d at 868).

¶11. In *Garrity*, New Jersey police officers, who were under investigation for corruption, were being questioned by the state attorney general's office. *Garrity*, 385 U.S. at 494. The officers were advised that they did not have to answer any questions, and that anything they said could be used against them in a criminal proceeding; however, the officers were also

---

[4] *Garrity v. New Jersey*, 385 U.S. 493 (1967).

6

told that refusal to answer the questions would result in termination from their employment. *Id.* The officers answered the questions and their statements were subsequently used against them at trial. The United States Supreme Court found that the statements were coerced and therefore inadmissable, holding:

> The choice given [the officers] was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice . . . is likely to exert such pressure upon an individual as to disable him from making a free and rational choice. We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.

*Id.* at 497; *see also Knebel v. City of Biloxi*, 453 So. 2d 1037, 1040 (Miss. 1984) (extending *Garrity* to include promises as well as threats holding that "a statement given under the promise that it will not be used against [the employee] in a criminal proceeding is likewise inadmissible"). Therefore, statements made by a police officer, which result from either the threat of termination if he does not answer or a promise that the statements will not be used in a criminal proceeding, are deemed to have been coerced and are therefore inadmissible in a subsequent criminal proceeding. It follows that in order for *Garrity* to be implicated, there must be some threat or promise to induce the statement.

¶12. At the suppression hearing, Thompson testified that during the investigation, he believed that he was required to participate in the investigation, and that if he failed to cooperate he would have been subject to disciplinary action up to, and including, termination from employment.

¶13. However, Chief Dubose testified that he did not, either expressly or impliedly, threaten Thompson with termination from employment if Thompson refused to cooperate

7

with the investigation. Chief Dubose further testified that he did not promise Thompson that he would not be prosecuted or that criminal charges would not be brought against him. Chief Dubose stated that police officers enjoy the same constitutional protections as every other citizen and are not forced to incriminate themselves.

¶14. During the hearing, the State introduced MPD's General Orders into evidence. Section II.A of the General Orders provides:

> [MPD] employees enjoy the same constitutional rights afforded any other citizen of the United States and shall not be intimidated during internal investigations, nor shall their constitutional rights be violated in any manner . . . . During . . . an investigation, the officer . . . shall not be threatened with transfer, dismissal[,] or disciplinary action as a result of his or her constitutional rights.

Thompson testified that he was given a copy of the MPD's General Orders upon becoming a police officer, that he was expected to know those orders, and that he was in fact familiar with MPD's General Orders. Thompson further acknowledged that he understood the rights afforded to him by both *Garrity* and *Miranda*.[5]

¶15. Chief Shelbourn also testified at the supersession hearing. Chief Shelbourn stated that he met with Thompson on January 12, 2010. According to Chief Shelbourn, the purpose of the meeting was to discuss seven disciplinary issues in Thompson's personnel file. During the meeting, Chief Shelbourn went over each disciplinary matter with Thompson and asked Thompson "did you do this," and each time Thompson answered "yes." Chief Shelbourn testified that he did not tell Thompson that if he did not cooperate that his employment would be terminated, and did not make any promises to induce Thompson to confess. According

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

to Chief Shelbourn, Thompson was free to end the interview and leave at any time.

¶16.   Furthermore, Thompson admitted that he voluntarily agreed to submit to the polygraph examination. Prior to undergoing the examination, Thompson was advised of his *Miranda* rights and signed an advice-of-rights form. Agent Sypniewski testified that he did not have any contact with anyone from MPD prior to administering the examination.[6] Agent Sypniewski testified that, at the conclusion of the polygraph examination, he informed Thompson that he found Thompson's answers to be deceptive; Thompson then admitted to creating and faxing a "bogus" subpoena to AT&T. Agent Sypniewski testified that he did not make promises of any kind to Thompson.

¶17.   Based on the evidence and testimony at the hearing, the trial court found that Thompson's statements were voluntarily given and made without the element of coercion necessary to invoke *Garrity*. The trial court found "no credible evidence that any threats or promises, either express or implied, were made to [Thompson] . . . to induce [him] into making any incriminating statements . . . ."

¶18.   Upon reviewing the record of the proceedings, we cannot say that the trial court applied an erroneous legal standard or was clearly erroneous in its findings of fact. Thus, we find that the trial court did not abuse its discretion in denying Thompson's motion to suppress his statements to Chief Dubose, Chief Shelbourn, and Agent Sypniewski. Accordingly, this issue is without merit.

---

[6] According to Agent Sypniewski, Chief Dubose requested assistance from the FBI field office. Agent Sypniewski was briefed by another agent and sent to conduct the examination.

9

**II.     Whether Thompson was prohibited from presenting evidence supporting his theory of defense.**

¶19.    Thompson next argues that the trial court prohibited him from presenting evidence in support of his theory of defense.  According to Thompson, his theory of defense was that his alleged conduct was a misdemeanor that was handled internally by MPD.  Thompson asserts that by excluding certain evidence and testimony, and permitting the State to question witnesses outside the scope of redirect examination, the trial court prevented him from presenting this theory of defense at trial.

¶20.    This Court reviews a trial court's admission or exclusion of evidence for an abuse of discretion.  *Richardson v. State*, 74 So. 3d 317, 329 (¶39) (Miss. 2011).  The trial court must exercise its discretion "within the confines of the Mississippi Rules of Evidence."  *Id.*  We reverse "only if such discretion has been abused and a substantial right of a party has been affected."  *Id.*

¶21.    We fail to see how the fact that Thompson's alleged conduct may conform to one of several misdemeanor offenses, in addition to a felony offense, is relevant to Thompson's theory of defense at trial.  Thompson was indicted on one count of wire fraud pursuant to Mississippi Code Annotated section 97-19-83.  Section 97-19-83 provides, in part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining . . . property or services, . . . by means of false or fraudulent pretenses, representations or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, transmits or causes to be transmitted by mail, telephone, newspaper, radio, television, wire, electromagnetic waves, microwaves, or other means of communication . . . any writings, signs, signals, pictures, sounds, data, or other matter across county or state jurisdictional lines, shall, upon conviction, be punished by a fine of not more than Ten Thousand Dollars ($10,000.00) or by imprisonment for not more than five (5) years, or . . . both[.]

10

Thompson's indictment read, in part, that Thompson:

> [B]etween the dates of December 20, 2007[,] through December 24, 2007, . . . . did wilfully, unlawfully[,] and feloniously devise a scheme to obtain the property of AT&T . . . by submitting a fraudulent Court Order/Subpoena for the cell phone records of Stacy Thompson . . . to the AT&T National Compliance Center. Said fraudulent Court Order/Subpoena was transmitted by telephone, via facsimile, from Meridian, Mississippi[,] across state jurisdictional lines to the State of Florida[.]

Thompson does not argue that his indictment was defective or insufficient; instead, Thompson merely asserts that his alleged conduct more properly constituted one of several misdemeanors, namely: impersonating a public officer or employee, impersonating an officer or state-agency employee, and unauthorized use of a name in communication.

¶22. Our caselaw is well settled that "where two or more statutes govern a given course of conduct, the State may elect to proceed under either statute, so long as the accused is given fair notice of the crime charged." *Hughes v. State*, 106 So. 3d 836, 840 (¶10) (Miss. Ct. App. 2012); *see also Cumbest v. State*, 456 So. 2d 209, 223 (Miss. 1984) ("Even if the criminal statutes cover the same criminal act in virtually the same language . . . and one provides for a greater penalty than the other, the [S]tate . . . may proceed under either."); *Smith v. State*, 106 So. 3d 877, 881 (¶11) (Miss. Ct. App. 2013) ("[T]he State is under no obligation to prosecute under the statute with the lesser penalty. It may choose to prosecute under either, and so long as the choice is clear and unequivocal the defendant has no right to complain."); *Keith v. State*, 999 So. 2d 383, 392 (¶26) (Miss. Ct. App. 2008) ("When a defendant's actions constitute a crime under more than one statute, the State is not obligated to pursue criminal charges under the statute with the lesser penalty, but may choose any applicable statute so long as its choice is clear.").

11

¶23.     Nevertheless, a defendant enjoys "an absolute right to have the jury instructed on lesser included offenses if the evidence supports such an instruction." *Leagea v. State*, 138 So. 3d 184, 188 (¶11) (Miss. Ct. App. 2013) (quoting *Downs v. State*, 962 So. 2d 1255, 1260 (¶22) (Miss. 2007)).  Here, the trial court properly instructed the jury as to possible lesser included offenses.  The jury was given instructions on the lesser misdemeanor offenses of impersonating a public officer or employee and unauthorized use of the name of another person to a telegram, petition, or related communication.  Thus, we find that Thompson was not denied his right to present his theory of defense at trial.  That notwithstanding, we will address the merits of Thompson's claims.

¶24.     According to Thompson, the trial court "crippled" his ability to present his theory of defense by: granting the State's motion in limine to prohibit Investigator Knight from testifying that Thompson's alleged conduct was a misdemeanor; sustaining the State's objections to the admittance of a letter from Chief Dubose to Thompson; and allowing the State to negate his defense by improperly questioning witnesses outside the scope of redirect examination.  We disagree.

### A.     Investigator Knight

¶25.     Thompson contends that the trial court erred in prohibiting him from presenting supporting evidence of his theory of defense by granting the State's motion in limine to exclude the opinion testimony of Investigator Knight as to whether Thompson's alleged conduct constituted a felony or a misdemeanor.

¶26.     "The admission of expert testimony is addressed to the sound discretion of the trial judge.  Unless we conclude that the discretion was arbitrary and clearly erroneous, amounting

12

to an abuse of discretion, that decision will stand." *Holliday v. State*, 758 So. 2d 1078, 1080 (¶5) (Miss. Ct. App. 2000) (quoting *Roberts v. Grafe Auto Co. Inc.*, 701 So. 2d 1093, 1098 (Miss. 1997)).

¶27.    Here, Investigator Knight was testifying as a lay witness and was not tendered as an expert witness.  However, Thompson sought to elicit Investigator Knight's opinion as to whether Thompson's conduct constituted a misdemeanor or the felony crime of wire fraud. Mississippi Rule of Evidence 701 provides:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

In granting the State's motion in limine, the trial court excluded any opinion testimony by Investigator Knight as to whether Thompson's conduct constituted a felony or a misdemeanor.  However, the trial court ruled that "[Investigator] Knight [could] give factual testimony regarding his investigation and the evidence found in the course of his investigation."

¶28.    We find that the trial court's exclusion of Investigator Knight's opinion testimony was not an abuse of discretion.  At trial, Investigator Knight testified that he never conducted an investigation into the forgery incident.  Investigator Knight testified that his knowledge of Thompson's conduct was based solely on what Chief Dubose told him.  During cross-examination, the following exchange occurred between the State and Investigator Knight:

Q.    So you never explored it criminally?

13

Q.     And [Investigator Knight,] . . . did you base [your] opinion solely on what you heard from [Chief] Dubose . . . or did you base it on your investigation?

A.     No, just solely [on] what I heard from the chief and his assistant chief.

Thus, Investigator Knight's opinion was not based on his own perception but on information given to him by Chief Dubose. Additionally, we do not see how Investigator Knight's opinion would be helpful to the fact-finder. The issue of whether the crime of wire fraud occurred was an issue for the jury to decide. *See Holliday*, 758 So. 2d at 1081 (¶8) (holding that "[t]he issue of whether [the crime] occurred was an issue for the jury to the decide"). Thus, even if Thompson tendered Investigator Knight as an expert witness, the trial court was within its discretion in excluding his opinion testimony because no special knowledge was needed to aide the jury in determining whether Thompson committed wire fraud. Finally, this issue is moot because, at trial, Investigator Knight testified that in his opinion, the incident "was a personnel matter . . . and my district commander . . . agreed." Thus, the excluded testimony that Thompson complains of was ultimately presented to the jury. This issue is without merit.

### B.     Letter from Chief Dubose to Thompson

¶29.     Thompson next argues that the trial court erred in sustaining the State's objection to the admission into evidence of a letter from the MPD to Thompson. Thompson argues that this exclusion prohibited him from presenting his theory of defense, as this letter contained information pertaining to the administrative punishment that he received from MPD.

14

¶30.    During Thompson's cross-examination of Mark McDonald, the City's chief administrative officer, Charles Wright, Thompson's trial counsel, presented McDonald with a letter, purportedly sent by Chief Dubose to Thompson on March 18, 2008, concerning disciplinary action taken against Thompson by MPD.   Upon presenting the letter to McDonald, the following exchange occurred between Wright; McDonald; Stanley Alexander, counsel for the State; and the trial court:

| | |
|---|---|
| [Wright]: | Are you aware that on March 18th . . . Chief Dubose sent a letter concerning disciplinary action against [Thompson] on March 18, 2008? |
| [McDonald]: | To be specific on all of the issues that are in [Thompson's] file . . . . |
| . . . . | |
| [Wright]: | I am asking you, are you familiar with this letter being sent to [Thompson] on March the 18th? |
| [McDonald]: | No, sir, not specifically. |
| [Wright]: | Okay . . . . I would like this marked for identification. |
| [Alexander]: | Your Honor, I am going to object . . . .  He says he is not aware of the letter. |
| [Trial Court]: | I will sustain the objection. |
| [Wright]: | I would still like to have it [marked] for identification only. |
| [Trial Court]: | No sir.  He . . . said he didn't know about it. |
| [Wright]: | Okay. |
| [Trial Court]: | You can ask Chief Dubose. |

Mississippi Rule of Evidence 901 governs the requirement of authentication or identification

15

of evidence. Rule 901 provides that authentication or identification is a condition precedent to admissibility. M.R.E. 901(a). The authentication or identification requirement is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.*

¶31. Here, it is clear that McDonald did not have sufficient knowledge of the letter for the purposes of authentication or identification. Thus, the trial court did not abuse its discretion by sustaining the State's objection to the letter being marked for identification at that time. As the trial court noted, nothing prevented Thompson from introducing the letter during Chief Dubose's testimony, which Thompson did, and the letter was admitted into evidence at that time.

### C. Redirect Examination

¶32. Finally, Thompson argues that the trial court erred by permitting the State to "negate" his theory of defense by improperly questioning witnesses outside the scope of redirect examination.

¶33. "The scope of redirect examination, while largely within the discretion of the trial court, is limited to matters brought out during cross-examination." *Lloyd v. State*, 755 So. 2d 12, 14 (¶9) (Miss. Ct. App. 1999). However, "we will not disturb a trial court's ruling on matters pertaining to redirect examination unless there has been a clear abuse of discretion." *Id.*

¶34. The line of questioning that Thompson complains of involved hypothetical questions that sought to elicit the fact that a person's misconduct may result in both termination from employment and criminal charges. For instance, during the redirect examination of

16

McDonald, the following exchange occurred between the State and McDonald:

> Q.    [I]f an employee [who] works for the City . . . embezzles some money
>       from the City . . . would that person be subject to termination?
>
> A.    Yes, sir.
>
> Q.    Would you also turn that person over to the police . . . ?

Likewise, during the redirect examination of Investigator Cribb, the following exchange

occurred:

> Q.    All right.  If you got a DUI driving home, what do you think your boss
>       . . . .  What would he do to you?
>
> A.    He'd fire me.
>
> Q.    Now, would that stop the [police department] . . . from prosecuting you
>       for a DUI?[7]

¶35.    We disagree with Thompson's assertion that these questions were outside the scope

of redirect examination.  In each instance, this line of questioning was in response to

Thompson's questions during cross-examination.  For instance, during Thompson's cross-

examination of McDonald, Thompson questioned McDonald regarding the City's decision

to refer the matter to the Attorney General's Office and asked: "Now, were you aware in your

investigation in the City's disposition of [Thompson] that . . . these alleged forgeries . . . were

handled administratively?"  Likewise, during the cross-examination of Investigator Cribb,

Thompson asked: "Are you aware that [Thompson] was disciplined by [MPD] in March of

2010 for this Robbie Jones/Rita Jack subpoena?"

¶36.    It is clear that Thompson, through his questioning, was attempting to establish that

_____

[7] A similar hypothetical question was used during the redirect examination of Chief
Dubose and Chief Shelbourn.

Thompson was already punished administratively for his misconduct. Thus, the State's attempt to blunt this fact on redirect examination by demonstrating that administrative punishment does not preclude criminal charges was properly within the scope of redirect examination. Accordingly, this issue is without merit.

**CONCLUSION**

¶37. We find that the trial court did not abuse its discretion when it denied Thompson's motion to suppress statements that Thompson made during the internal investigation. The trial court's findings of fact were not clearly erroneous, nor did the trial court apply an erroneous legal standard in finding that Thompson's statements were voluntarily given and made without the element of coercion necessary to invoke *Garrity*. Likewise, we find that the trial court did not abuse its discretion in the admission and exclusion of evidence and that Thompson was not improperly prohibited from presenting his theory of defense at trial. Accordingly, the judgment of conviction is affirmed.

¶38. **THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY OF CONVICTION OF WIRE FRAUD AND SENTENCE OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FOUR YEARS SUSPENDED, ONE YEAR TO BE SERVED UNDER THE INTENSIVE SUPERVISION PROGRAM, AND FIVE YEARS OF SUPERVISED PROBATION, AND TO PAY A $2,500 FINE AND $500 TO THE CRIME VICTIMS' COMPENSATION FUND, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LAUDERDALE COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**